ESTATE OF JEANETTE ANDERSEN, Deceased, MARCIA A. MURPHY, Executrix, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Andersen v. Commissioner
Docket No. 292-72.
United States Tax Court
T.C. Memo 1973-248; 1973 Tax Ct. Memo LEXIS 39; 32 T.C.M. (CCH) 1164; T.C.M. (RIA) 73248; November 14, 1973, Filed Sidney C. Ward and John H. Ward, for the petitioner. Donald W. Williamson, Jr., for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency of $3,070,532.09 in petitioner's Federal estate tax. Because of concessions by both parties, the sole issue for our decision is whether the value of assets in a certain trust is includable in the gross estate of Jeanette Andersen under section 2036(a) (1). [1] 2 FINDINGS OF FACT Some of the facts have been stipulated and *40 are so found. Jeanette Andersen (Jane or the decedent) died on December 4, 1968, at the age of 65. The duly qualified executrix of Jane's estate, Marcia Andersen Murphy (petitioner), filed the estate's Federal estate tax return in 1970 with the district director of internal revenue, Jacksonville, Florida. At the time of the filing of the petition herein, petitioner, who is the decedent's daughter, was a resident of Orlando, Florida. Jane married Martin Andersen (Martin) on March 6, 1924. In 1931, Martin, who had been in the newspaper business for many years, took a management position with Orlando Daily Newspapers, Inc. (ODN or the newspaper), which was then the publisher of the Orlando Sentinel and the Orlando Star. Sometime in late 1931 or early 1932, Martin, at Jane's urging, asked the owner of ODN, Charles P. Marsh (Marsh), for some stock in the newspaper. Marsh, who was anxious that Martin remain with the paper, consented and on June 11, 1932, he gave Martin a 10-percent stock interest in ODN. Later, in 1935, Marsh gave Martin an option to purchase a controlling block of shares, but Martin did not exercise such option until 1945. Martin's duties at the paper in the 1930's *41 included 3 those of editor, publisher, and president. While Jane did not actively participate in the corporate aspects of the business, she did occasionally contribute to the newspaper's society column. In 1936, Martin decided to make a gift to Jane of all the stock he owned in ODN, except for a qualifying director's share. Accordingly, on or about October 20 of that year, B. C. Walls (Walls), the corporate bookkeeper and secretary-treasurer, issued certificates to Jane in her name for 110 shares of ODN stock. At the same time, a similar amount of stock in Martin's name was canceled, thus leaving him the record owner of only a single share of stock. The transaction took place in Walls' office at the newspaper, and Jane left such office with the certificates in her possession. There is no credible evidence to suggest that she surrendered such possession to any other person before the transfer in trust to be discussed below. Martin filed a timely Federal gift tax return in connection with the transfer and Jane filed a timely donee's information return acknowledging receipt of the stock reflected in Martin's gift tax return. The stock was valued at $11,000 on the returns. *42 4 Between the time of the transfer in 1936, and the transfer in trust in 1941, Jane acted and was recognized as the owner of the aforementioned shares of stock. Shortly after the transfer, when Jane thought the shares had been misplaced or stolen, it was she alone who went to Walls and adked that new certificates be issued in their place. Pursuant to his request, Jane completed an affidavit attesting to her belief as to the shares and Walls soon afterwards issued new certificates to her. Between 1936 and 1940, Jane's name was listed as a shareholder on required annual public reports by ODN of its ownership, management and circulation. She also received all the dividend checks on such stock during those years, and paid the taxes arising therefrom. The stock, however, was not readily marketable at that time, and Jane did not sell any of the shares. One week after the transfer, on October 27, 1936, Jane wrote a letter to the First National Bank of Orlando in which she authorized Martin to utilize 74 of the transferred shares as security "for any and all loans made to him and for all of his personal liabilities and obligations to you [Bank]." Such authorization was given *43 in order to obtain the bank's approval for a loan of between $8,000 and $10,000, to be used to pay for additions to the family home. Such additions, 5 which included some new bedrooms, an enlargement of the den, and a new sunporch, had been a pet project of Jane's for some time. There is no evidence in the record, however, that the shares of stock were pledged for any other obligation of either Martin or Jane. Nor is there anything in the record to suggest that Jane agreed to such authorization prior to the October 20, 1936, transfer, or that her freedom to deal in the future with the stock was in any way limited by agreement with Martin or otherwise at that time. In the early 1940's discords developed in the marriage. In light os such problems, Martin became concerned over Jane's unrestricted ownership and holding of the ODN stock. He feared that if a divorce occurred in the future the shares might come under the influence of persons not currently in the Andersen family. It had always been Martin's hope that the shares would be held only for the benefit of Jane, and later their daughters. In addition, he feared that his own ability to direct the affairs of ODN would be *44 hampered if an outsider, Jane's new husband if she should remarry for example, were to have an influence over the handling of the shares then in Jane's hands. He discussed these concerns with his attorney, George Johnson (Johnson), sometime in 1941. Johnson recommended that a trust instrument be drawn up under which Jane would 6 make an irrevocable transfer of the shares to Martin as trustee. Martin agreed, and asked Johnson to seek Jane's approval of such transfer. Johnson proceeded to draft a deed of trust, the final form of which was acceptable to Jane. Before the trust was actually executed, Johnson went over the provisions of the proposed trust with Jane. During such discussions, he explained to her the import of the trust provisions, especially the fact that Jane would have to part with all future control over the shares. On March 25, 1941, in the presence of Johnson and Norbert Consonni (Consonni), Walls' successor as secretary-treasurer of the paper, Jane executed an irrevocable transfer in trust to Martin, as trustee, of the 110 shares of ODN stock given her in 1936. Consonni canceled the 110 shares of ODN stock which had been in Jane's name on the books since *45 1936, and issued a new certificate for the same number of shares to Martin as trustee under the executed trust document. The trust agreement was recorded in the public records of Orange County, Florida, on August 17, 1965. Under the trust, Jane retained a life interest in income, which was to be paid to her at "convenient intervals." Martin received broad powers, as the fiduciary, to deal with the trust corpus: 7 It is my intention that in the management of the Trust Estate the Trustees shall have as full and complete power, authority and discretion as they would have if they were the actual owners thereof. Martin and petitioner, Jane's daughter, received contingent life interests in income, and upon the latter's death, the corpus would go outright to her children. If no such children were surviving at the time of petitioner's death, one-half the corpus would go to the children of Martin's sister and one-half to the children of Jane's sister. The trust was similar to one executed by Martin the previous year in which he had placed in trust 55 shares of ODN stock for petitioner, except that under that trust if petitioner died without issue, the corpus would go to his brothers *46 and sisters alone. Sometime during the Second World War, Martin and Jane separated. It is not clear from the record, however, whether such separation was continuous to the time of their divorce on February 7, 1950. Prior to such divorce, on January 5, 1950, the parties, represented by separate and independent counsel, [2] entered into a property settlement agreement. Under such arrangement Martin was required, among other obligations to Jane and the children, to pay Jane $1,250 per month. Such amount, however, which was thought by the parties to represent 8 a reasonable living allowance for Jane, was to be reduced each month by any distributions of trust income to Jane during such month. In the event Jane remarried, she would no longer be entitled to any of the monthly payments under the agreement, but would receive a lump sum payment of $10,000. A remarriage, however, it was provided in the agreement, would in no way affect her right to the trust income. Jane in fact never remarried. [3]
*47 As trustee, Martin made monthly accountings to Jane through Consonni. The trust corpus, in the late 1960's, was diversified to include municipal bonds, real estate, and other items. It is not clear whether all of such diversification was a result of reinvestment of the trust proceeds, or whether some came from additions to corpus from other parties. Up to the time of her death in 1968, Jane received all trust income to which she was entitled under the 1941 instrument. Through March 31, 1966, $418,288.79 of income was generated by the trust, with net distributions to Jane exceeding such figure by approximately $20,000. It is established that she included all trust income in her annual Federal income tax returns, at least after her divorce in 1950, and there is nothing in the record to suggest that this 9 is not also true as to any income received before such time. Upon her death, any accumulated and undistributed income became payable to her estate. Over the years, the ODN stock in the trust increased dramatically in value, reflecting the great success of Martin in expanding the circulation of the newspapers. On August 31, 1965, the stock was sold to the Sentinel Star *48 Company, a subsidiary of the Chicago Tribune, for promissory notes in the face amount of approximately $5,000,000. Fifteen of the notes were in the face amount of $242,179.50, one of which became due on August 31 of each year. Quarterly interest payments were required. The other note for $1,453.077 was due in 1980, again with quarterly interest payments required. Four of the notes in the lesser amount were paid prior to Jane's death, so that at the time of her death there remained unpaid 11 notes in the lesser face amount, as well as the note due in 1980. Both the principal and interest due on the notes have been paid to the trust as and when due in accordance with the terms of the notes. In early 1967, Martin was informed by his attorneys that his role as trustee and contingent income beneficiary of the trust might cause the entire trust corpus to be included in his estate upon his death. Concerned that such might occur, 10 Martin executed a renunciation of his contingent life interest in the trust on January 25, 1967. In addition, he petitioned the Circuit Court, Orange County, Florida, to be released from his duties as trustee of the trust, and to approve the trust *49 accounts he was presenting to the court. On August 8, 1967, the court rendered its decree discharging Martin from the office of trustee, and appointing in his place petitioner and the First National Bank of Orlando. Such appointments were made as provided by a Supplemental Trust Declaration, executed by Jane on December 15, 1965. At the same time the court found the trust accounts submitted by Martin to be in order, and declared them "judicially settled and allowed." [4] For all of his work as trustee, Martin was awarded $125,000 by the court and this was the only compensation he received from the trust for his fiduciary duties and responsibilities.
On Jane's Federal estate tax return, petitioner included the undistributed and accumulated income of the trust, but not the value of the trust corpus. In his statutory notice of deficiency, respondent included in Jane's gross estate the value *50 of such trust corpus which he determined to be 11 $5,778,696.46. Subsequently, the parties have stipulated that the fair market value of the assets in the trust at the time of Jane's death was $4,853.196.46. OPINION The only issue for our decision is whether respondent has erred in including the value of the trust corpus, under section 2036(a) (1), [5] in Jane's gross estate. Petitioner, while not disputing that Jane did have a life interest in income under the trust, contends that Martin, rather than Jane was the real settlor of the trust, and hence, that section 2036(a) is inapplicable to Jane in the instant case. 12 Respondent disputes this assertion contending that the facts point to Jane as having been the trust settlor, and hence as having "retained" a life interest in the trust income. *51 The determination of who is the settlor of a particular trust is essentially a question of fact, to be determined on the basis of the entire record before the Court. . In the instant case, a resolution of this issue depends on the question of whether in 1936, Martin made a completed gift to Jane of the ODN share eventually transferred in trust. If the gift was complete, vesting rights of ownership in her, then it can only have been Jane, on the record before us, who could have made the stock transfer in 1941. We find that there was a completed gift from Martin to Jane in 1936, and that hence, respondent acted properly in including in Jane's gross estate the value of the trust corpus on the date of her death. The essential elements of an inter vivos gift may be summarized as follows: (1) competent donor and donee; (2) delivery to donee of the particular assets; (3) relinquishment of actual dominion and control over transferred assets to donee; (4) acceptance of transferred assets by donee. ; , affd. *52 (C.A. 5, 1936), certiorari denied . 13 In the instant case, only the presence of condition (3) is in serious dispute between the parties. As to such condition, we have found above that from the time of the transfer of the ODN shares to her in 1936, Jane acted as their actual and unconditional owner. At the time of the actual transfer, there is no evidence that she had any agreement or understanding with Martin that shw would hold the stock on his behalf only. She received all the dividends on the stock and paid the taxes thereon. Because the stock at that time was not marketable, such dividends constituted the shares' major income producing feature. When the share certificates were apparently misplaced, it was she who reported such to Walls, and then executed the affidavit required to obtain the new certificates. Finally, it was she who executed the trust instrument in 1941 in which she reserved for herself a life interest in the income, and provided for devolution of the corpus on the death of the income beneficiaries. All these actions, we think, are consonant with a real ownership of the stock in her at the time *53 of the transfer in trust, and with a finding that a completed gift had been made to her five years before. It is true that one week after the transfer of the stock in 1936, Jane did inform the First National Bank of Orlando 14 that she was authorizing Martin to use 74 of the shares as collateral for loans from such bank. Such authorization, however, despite its broad language, was given specifically that bank funds might be obtained to pay for proposed additions to the family home. Such additions were greatly desired by Jane, and we think it can be assumed that she was anxious to see to it that funds for construction were available. There is no evidence that the ODN shares transferred to Jane secured any other loan or personal obligation of Martin's. [6] Thus, it cannot be found that the aforementioned authorization spawned any pattern of unrestricted use by Martin of the transferred shares. Petitioner has argued that the fact of the trust agreement itself demonstrates that Jane had little real say as to the stock. It is true that *54 it was Martin, concerned over the incipient marital discord, who approached Johnson and inquired as how the ultimate benefits of the shares could be kept within the present family circle. Petitioner, however, has produced no evidence indicating that Jane acted in any but a totally voluntary manner in executing the trust document drafted by Johnson. She signed the document only after a thorough 15 explanation by Johnson of the effect of her irrevocable transfer to Martin as trustee. While Jane was probably not well-versed in financial matters, we still think it unlikely that she would not have understood, after Johnson's explanation, how her rights to act as owner and to control the stock would be affected by the trust. Furthermore, we think that the existence of the marital discord may well have caused her to be less willing to follow the advice or dictates of her husband, especially with regard to assets which she had been handling as her own. Petitioner points to the irrationality from the standpoint of Jane's interest of the irrevocable character of the trust. Accepting, for the moment, this contention, it may be observed that it is not to be disputed that people may *55 and often do act with poor judgment in handling their own property. Furthermore, in the instant case, we find it to be entirely understandable that Jane, not particularly versed and involved in financial matters, would have appreciated the security of a permanent arrangement giving her and later her children the economic benefits of the stock.Clearly, the making of such decision is the prerogative of any person as to assets he owns, and does not shed the doubt on actual ownership that petitioner has claimed. 16 Petitioner has cited a number of cases which, it is argued, compel a holding in the instant case that Martin and not Jane was the true settlor of the 1941 trust. Suffice it to say that the cases cited are clearly distinguishable on their facts, and that it would serve no useful purpose to discuss such cases here. Reviewing all the facts before us, we find that ownership of the 110 shares of ODN stock shifted from Martin to Jane in 1936, and that Jane furnished the consideration, and was hence the real settlor of the trust in 1941. 2 Scott, Trusts, sec. 156.3, pp. 1201-2 (3d ed. 1967). Thus, we uphold respondent's inclusion of the value of the trust assets in Jane's *56 gross estate. To reflect concessions by both parties, Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. Jane was represented in the negotiations by Johnson. ↩
3. The property settlement was amended in 1954 to provide a $1,500 a month payment to Jane, rather than the aforementioned $1,250. The treatment of trust was the same, however. ↩
4. On March 1, 1967, petitioner and Jane each executed a "Waiver of Service of Process and Consent," in which they stated that they found acceptable Martin's trust amounts, and would be agreeable to a court decree settling such amounts and discharging Martin from his position as trustee. ↩
5. SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death - (1) * * * the right to the income from, the property * * * ↩
6. Indeed, petitioner has presented no evidence that the note for the additions to the family home was not cosigned by Martin and Jane. ↩